**24-11230**

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

SHERIFF OF BROWARD COUNTY,

Plaintiff/Appellee,

v.

EVANSTON INSURANCE COMPANY,

Defendant/Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
No. 22-cv-62076-WPD

_____

# INITIAL BRIEF OF APPELLANT
# EVANSTON INSURANCE COMPANY

_____

Samuel B. Spinner (FBN 118922)
CARLTON FIELDS, P.A.
700 N.W. 1st Avenue
Suite 1200
Miami, Florida 33136
sspinner@carltonfields.com

Joseph H. Lang, Jr. (FBN 59404)
CARLTON FIELDS, P.A.
4221 W. Boy Scout Blvd.
Suite 1000
Tampa, Florida 33607
jlang@carltonfields.com

_Attorneys for Defendant/Appellant Evanston Insurance Company_

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and 11th Circuit Rule 26.1-1(a), Defendant-Appellant Evanston Insurance Company provides this Certificate of Interested Persons and Corporate Disclosure Statement. The following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal:

1. Allhalel, Joshua R. (Counsel for Plaintiff/Appellee)

2. Allhalel Law (Counsel for Plaintiff/Appellee)

3. Augustin-Birch, Honorable Panayotta D. (United States Magistrate Judge for the Southern District of Florida)

4. Carlton Fields, P.A. (Counsel for Defendant/Appellant)

5. Dimitrouleas, Honorable William P. (United Stated District Judge for the Southern District of Florida)

6. Evanston Insurance Company (Defendant/Appellee)

7. Ferguson, David (Counsel for Plaintiff/Appellee)

8. Fields, Alexis (Counsel for Plaintiff/Appellee)

9. Haimovitch, Seth D. (Counsel for Plaintiff/Appellee)

10. Kennedys CMK, LLP (Counsel for Defendant/Appellant)

11. Kopelowitz Ostrow Ferguson Weiselberg Gilbert (Counsel for Plaintiff/Appellee)

12. Lang Jr., Joseph H. (Counsel for Defendant/Appellant)

13. Lewis, Jordan H. (Counsel for Defendant/Appellant)

14.     Markel Group, Inc. (**NYSE: MKL**) (see disclosure statement below)

15.     Mazer, Jason S. (Counsel for Plaintiff/Appellee)

16.     Mazer Law P.A. (Counsel for Plaintiff/Appellee)

17.     Perkins, Kristen D. (Counsel for Defendant/Appellant)

18.     Spinner, Samuel B. (Counsel for Defendant/Appellant)

19.     Tony, Gregory, in his official capacity as Sheriff of Broward County (Plaintiff/Appellee)

20.     Vander Klok, Jedidiah D. (Counsel for Defendant/Appellant)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, undersigned counsel hereby certifies that Defendant/Appellant Evanston Insurance Company is a wholly-owned subsidiary of Markel Group., Inc., a publicly-traded company (**NYSE: MKL**). No individual or entity owns more than 10% of Markel Group, Inc. stock.

## STATEMENT REGARDING ORAL ARGUMENT

Evanston Insurance Company ("Evanston") submits that this appeal involves novel issues regarding interpretation of Florida Supreme Court precedent and whether Florida law recognizes a sophisticated insured exception to *contra proferentem*. Oral argument would assist the panel in deciding these issues.

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................ i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF CITATIONS ........................................................................ iv

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE..................................................................3

    A.    The Parkland Shooting Incident ...............................................5

    B.    BSO's Amended Complaint .....................................................5

    C.    The *Koikos* Decision .............................................................8

    D.    Evanston's Motion to Dismiss ...............................................11

    E.    BSO's Sophisticated Insurance Program.................................12

    F.    The State National Litigation .................................................14

    G.    BSO's Predecessor Policy .....................................................15

    H.    The Subject Policy ...............................................................17

    I.    Motions for Summary Judgment............................................18

    J.    Omnibus Summary Judgment Order.......................................21

    K.    Final Judgment and Appeal ...................................................22

SUMMARY OF ARGUMENT .................................................................23

# TABLE OF CONTENTS
## (continued)

*Page*

ARGUMENT .................................................................25

I.    Standard of Review .........................................25

II.   The District Court Lacked Jurisdiction Under The
Declaratory Judgment Act.................................................26

    A.    The Declaratory Judgment Act ...................................26

    B.    The Policy's Conditions of Coverage .........................27

    C.    The Parkland Shooting Incident Cannot Trigger
Coverage.................................................29

    D.    BSO Did Not Satisfy the AAD .................................31

III.  The Parkland Shooting Incident Constitutes Multiple
Occurrences .................................................33

    A.    *Koikos* Did Not Rule on Ambiguity Grounds ...........34

    B.    Courts Do Not Apply *Koikos* Based on Ambiguity .................37

    C.    The District Court Relied on Inapposite Authority ...................42

    D.    Each Shooting Constituted a Separate Occurrence ...................45

IV.  The District Court Erred in Applying *Contra
Proferentem* .................................................46

    A.    *Contra Proferentem* Under Florida Law ...................46

    B.    The Sophisticated Insured Exception .........................47

    C.    BSO is a Sophisticated Insured .................................50

D.    The Parties Intended to Treat the Parkland Shooting
Incident as Multiple Occurrences ................................................. 52

CONCLUSION ......................................................................................... 56

CERTIFICATE OF COMPLIANCE ........................................................ 57

CERTIFICATE OF SERVICE ................................................................. 58

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*,
925 F.3d 1205 (11th Cir. 2019) ....................................................26, 27

*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937)..........................................................................27

*Allstate Ins. Co. v. Orthopedic Specialists*,
212 So. 3d 973 (Fla. 2017) ...............................................................25

*Allstate Ins. Co. v. Shofner*,
573 So. 2d 47 (Fla. 1st DCA 1990) ...................................................54

*Am. Indem. Co. v. McQuaig*,
435 So. 2d 414 (Fla. 5th DCA 1983)..................................................36

*Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*,
480 P.3d 1225 (2021).........................................................................48

*Auto-Owners Ins. Co. v. Anderson*,
756 So. 2d 29 (Fla. 2000) ...........................................................25, 46

*Balarezo Family Chiropractic, LLC v. State Farm Mut. Auto. Ins. Co.*,
2024 WL 1343178 (S.D. Fla. Feb. 12, 2024) ....................................33

*Barnett v. Dep't of Fin. Servs.*,
303 So. 3d 508 (Fla. 2020) ...............................................................44

*BellSouth Commc'ns Sys., L.L.C. v. West*,
902 So. 2d 653 (Ala. 2004)...............................................................48

*Belt v. USAA Cas. Ins. Co.*,
312 So. 3d 947 (Fla. 4th DCA 2021)..................................................40

*Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*,
2009 WL 1953649 (M.D. Fla. July 6, 2009) .....................................40

*Cardinal Point, LLC v. Edgewood Partners Ins. Ctr., Inc.*,
  2024 WL 1632740 (S.D. Fla. Apr. 16, 2024) ............................................49, 55

*Castleberry v. Goldome Credit Corp.*,
  418 F. 3d 1267 (11th Cir. 2005) ...........................................................48

*Cont'l Cas. Co. v. Wendt*,
  205 F.3d 1258 (11th Cir. 2000) ...........................................................53

*Cummins, Inc. v. Atl. Mut. Ins. Co.*,
  867 N.Y.S.2d 81 (1st Dep't 2008).................................................48, 50

*In re Delta Am. Re Ins. Co.*,
  900 F.2d 890 (6th Cir. 1990) ...............................................................51

*E. Associated Coal Corp. v. Aetna Cas. & Sur. Co.*,
  632 F.2d 1068 (3d Cir. 1980) ...............................................................48

*Eagle Leasing Corp. v. Hartford Fire Ins. Co.*,
  540 F.2d 1257 (5th Cir. 1976) ...............................................................48

*ECB USA, Inc. v. Chubb Ins. Co. of N.J.*,
  2024 WL 3975776 (11th Cir. Aug. 29, 2024) ...................................47

*El-Ad Residences at Miramar Condo. Ass'n, Inc. v.*
  *Mt. Hawley Ins. Co.*,
  2010 WL 11506385 (S.D. Fla. Dec. 9, 2010)......................................49

*EmbroidMe.com, Inc. v. Travelers Prop. Cas. Co. of Am.*,
  845 F.3d 1099 (11th Cir. 2017) ...........................................................41

*Fayad v. Clarendon Nat'l Ins. Co.*,
  899 So. 2d 1082 (Fla. 2005) ...............................................................35

*First Call 24/7, Inc. v. Citizens Prop. Ins. Corp.*,
  333 So. 3d 1180 (Fla. 1st DCA 2022) .............................................54

*First State Bank of Monticello v. Ohio Cas. Ins. Co.*,
  555 F.3d 564 (7th Cir. 2009) ...............................................................48

*Frulla v. CRA Holdings, Inc.*,
  543 F.3d 1247 (11th Cir. 2008) ...........................................................26

*Goldfarb v. Reliance Standard Life Ins. Co.*,
    106 F.4th 1100 (11th Cir. 2024) ........................................25

*Gov't Emps. Ins. Co. v. Macedo*,
    228 So. 3d 1111 (Fla. 2017) ............................................35

*Guideone Elite Ins. v. Old Cuter Presbyterian Church, Inc.*,
    420 F.3d 1317 (11th Cir. 2005) ......................37, 38, 41, 45

*In re Cassell*,
    688 F.3d 1291 (11th Cir. 2012) ........................................55

*Koikos v. Travelers Ins. Co.*,
    849 So. 2d 263 (Fla. 2003) ................................ 3–4, 8–12, 19–23, 33–45, 53–55

*Lamar Advertising Co. v. Zurich Am. Ins. Co.*,
    533 F. Supp. 3d 332 (M.D. La. 2021)................................48

*Liberty Mut. Fire Ins. Co. v. State Farm Fla. Ins. Co.*,
    2022 WL 1025164 (11th Cir. Apr. 6, 2022)......................40

*Maddox v. Fla. Farm Bureau Gen.*,
    129 So. 3d 1179 (5th DCA 2014)................................43, 44

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
    312 U.S. 270 (1941)..........................................................26

*Mid-Continent Cas. Co. v. Basedo*,
    477 F. App'x 702 (11th Cir. 2012)................................39, 40

*Musselwhite v. Fla. Farm Gen. Ins. Co.*,
    273 So. 3d 251 (Fla. 1st DCA 2019) ................................45

*N.H. Ins. Co. v. RLI Ins. Co.*,
    807 So. 2d 171 (Fla. 3d DCA 2002)..................................36

*Owners Ins. Co. v. Parsons*,
    610 F. App'x 895 (11th Cir. 2015)....................................27

*Pac. Emps. Ins. Co. of L.A. v. Ott*,
    545 So. 2d 462 (Fla. 3d DCA 1989)..................................53

*Pedroza v. State*,
  291 So. 3d 541 (Fla. 2020) ...............................................43

*Penzer v. Transp. Ins. Co.*,
  29 So. 3d 1000 (Fla. 2010) ...............................................25

*Plancher v. UCF Athletics Ass'n, Inc.*,
  175 So. 3d 724 (Fla. 2015) ...........................................29, 30

*People's Tr. Ins. Co. v. Restoration Genie, Inc.*,
  336 So. 3d 332 (Fla. 4th DCA 2022).................................25

*Praetorians v. Fisher*,
  89 So. 2d 329 (Fla. 1956) .................................................48

*Progressive Am. Ins. Co. v. Eres*,
  2016 WL 8999461 (M.D. Fla. Apr. 4, 2016)...................33

*Rouse Co. v. Fed. Ins. Co.*,
  991 F. Supp. 460 (D. Md. 1998)......................................48

*RTG Furniture Corp. v. Indus. Risk Ins.*,
  616 F. Supp. 2d 1258 (S.D. Fla. 2008).......................48, 49

*S. Cent. Educ. Risk Mgmt. Program v. Star Ins. Co.*,
  2018 WL 11353289 (S.D. Fla. Dec. 18, 2018)................40

*Salvato v. Blair*,
  2014 WL 12639958 (M.D. Fla. June 30, 2014) ..............32

*Santa Rosa Cnty. v. Admin. Comm'n, Div. of Admin. Hearings*,
  661 So. 2d 1190 (Fla. 1995) .............................................27

*Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.*,
  65 F.4th 623 (11th Cir. 2023) ..........................................47

*Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*,
  913 N.W.2d 687 (Minn. 2018) .........................................48

*State Farm Mut. Auto. Ins. Co. v. Spangler*,
  64 F.4th 1173 (11th Cir. 2023) ........................................25

*State Nat'l Ins. Co. v. Lamberti*,
2009 WL 764501 (S.D. Fla. Mar. 20, 2009) ...................... 14, 15, 38, 39, 40, 45

*State Nat'l Ins. Co. v. Lamberti*,
362 F. App'x 76 (11th Cir. 2010) ...................................................15, 38, 41, 53

*State Nat'l Ins. Co. v. City of Miami*,
2010 WL 11506250 (S.D. Fla. May 11, 2010)................................38, 40, 41, 45

*State Nat'l Ins. Co. v. City of Miami*,
403 F. App'x 478 (11th Cir. 2010) ....................................................................39

*Stonegate Bank v. TD Bank N.A.*,
596 F. App'x 834 (11th Cir. 2015) ....................................................................47

*Synergy Contracting Grp., Inc. v. People's Tr. Ins. Co.*,
391 So. 3d 505 (Fla. 2d DCA 2024)...................................................................25

*Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co.*,
913 So. 2d 528 (Fla. 2005) .........................................................................42, 43

*The Sch. Bd. of Broward Cnty. v. The Great Am. Ins.Co.*,
807 So. 2d 750 (Fla. 4th DCA 2002)..................................................................49

*Travelers Indem. Co. v. Garcia*,
2021 WL 2935425 (11th Cir. July 13, 2021) ....................................................39

*Travelers Ins. Co. v. Bartoszewicz*,
404 So. 2d 1053 (Fla. 1981) .................................................................46, 48, 54

*Village of Palmetto Bay, Fla. v. 17777 Old Cutler Road, LLC*,
390 So. 3d 88 (Fla. 3d DCA 2023).....................................................................43

*Warwick Corp. v. Alliant Ins. Servs., Inc.*,
227 So. 3d 621 (Fla. 4th DCA 2017)............................................................49, 55

*Washington Nat'l Ins. Corp. v. Ruderman*,
117 So. 3d 943 (Fla. 2013) ..........................................................................46, 47

*Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*,
856 F.3d 1343 (11th Cir. 2017) .........................................................................48

**Statutes**

28 U.S.C. § 1983 ................................................................32, 36

§ 11.066, Fla. Stat. ................................................................29

§ 768.28, Fla. Stat. ................................................13, 14, 29, 30

**Other Authorities**

*Holmes's Appleman on Ins.*, § 6.5 ..........................................48

*Resolving Ambiguities in Insurance Policy Language: The Contra
 Proferentem Doctrine and the Use of Extrinsic Evidence*, THE
 AMERICAN BAR ASSOCIATION (May 2003) ...........................51

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction over this removed action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000. The district court also determined that it had jurisdiction under 28 U.S.C § 2201. This Court has jurisdiction to address this appeal under 28 U.S.C. § 1291 because it arises from a final judgment signed and filed by the district court judge on March 20, 2024. Evanston timely appealed the final judgment on April 18, 2024.

## STATEMENT OF THE ISSUES

I.     Whether the district court erred in determining that the parties had a case or controversy under the Declaratory Judgment Act.

II.     Whether the district court erred in ruling that the insurance policy term "occurrence" is ambiguous based on *Koikos v. Travelers Insurance Co.*, 849 So. 2d 263 (Fla. 2003).

III.     Whether the district court erred in applying *contra proferentem* where BSO is a sophisticated insured.

## STATEMENT OF THE CASE

May an insurance policy definition previously construed as a matter of law by the Florida Supreme Court and this Court nonetheless be declared to be ambiguous in the same factual context? That is precisely what the district court determined in this insurance coverage dispute that is controlled by Florida law.

In *Koikos v. Travelers Insurance Co.*, 849 So. 2d 263 (Fla. 2003), the Florida Supreme Court held that when two victims were shot in the same incident by two separate gunshots, that incident resulted in two separate occurrences under the liability insurance policy at issue. The Florida Supreme Court rejected a contrary interpretation as unreasonable and adopted the cause theory, which provides that a separate occurrence arises from each injury-causing act. But, in dicta, the Florida Supreme Court noted that *if* the term "occurrence" were subject to two reasonable interpretations, then it *would be* considered ambiguous and construed in favor of a determination that the shooting incident resulted in two separate occurrences.

This case arises from the horrific mass shooting perpetuated by Nikolas Cruz at Marjorie Stoneman Douglas High School ("MSD") in Parkland, Florida (the "Parkland Shooting Incident"). As in *Koikos*, Cruz shot multiple people, but the shootings harmed significantly more victims and were separated by longer time intervals. The victims sued BSO for negligent security. BSO filed this declaratory relief action against its excess insurer, Evanston. (Doc. 20).

The parties' competing motions for summary judgment centered on whether the Parkland Shooting Incident constituted one occurrence or multiple occurrences. (Doc. 88; Doc. 93). The answer to that question determines whether BSO must exhaust only one $500,000 self-insured retention ("SIR") for all claims arising from the Parkland Shooting Incident, or whether it instead must exhaust a separate $500,000 SIR for each victim.

The district court granted BSO's motion and denied Evanston's motion. (Doc. 110). The district court declined to follow this Court's precedent and substituted the dicta in *Koikos* for its holding, declaring "occurrence" to be ambiguous. Accepting BSO's favored construction of that term, the district court ruled that the Parkland Shooting Incident was only one occurrence. In doing so, the district court rejected Evanston's argument that, even were "occurrence" ambiguous, it should not be construed against Evanston because BSO is a sophisticated insured that was represented by a multinational insurance broker and actively negotiated the policy's terms.

The district court's order contorts *Koikos* beyond recognition, contravenes precedent—including binding precedent of this Court—interpreting the same policy language, and misapplies *contra proferentem*. This Court should reverse.

## STATEMENT OF THE FACTS

### A.      The Parkland Shooting Incident.

On February 14, 2018, Cruz carried out the Parkland Shooting Incident, killing 17 people and wounding 17 others. (Doc. 20). The MSD Public Safety Commission issued a report on the Parkland Shooting Incident on which the parties relied to establish the timeline of the events. (Doc. 90-1; Doc. 90-2).

According to the report, Cruz was dropped off at MSD at 2:19 p.m. (Doc. 90-2 at 3). At 2:21 p.m., he entered the first floor of building 12 and shot several victims in the hallway. (Doc. 90-2 at 4). Cruz then fired into several classrooms and again into the hallway, killing and wounding several others. (Doc. 90-2 at 4–10). Cruz proceeded up to the third floor and, at 2:24 p.m., shot additional victims. (Doc. 90-2 at 10). Cruz fired his last shots at 2:27 p.m., after which he fled. (Doc. 90-2 at 12). Law enforcement apprehended Cruz about one hour later. (Doc. 90-2 at 16).

### B.      BSO's Amended Complaint.

BSO filed an amended complaint for declaratory relief against Evanston arising from the Parkland Shooting Incident. (Doc. 20). BSO alleged the incident spawned numerous lawsuits against BSO and Scot Peterson—the BSO school resource officer stationed at MSD—alleging they negligently failed to prevent the shooting. (Doc. 20 at ¶¶ 7–9). BSO attached the complaints from two such lawsuits pending against it in Florida state court. (Doc. 20-1; Doc. 20-2).

Evanston issued to BSO policy number MPEMID0002-16-01 effective from October 1, 2017, to October 1, 2018 (the "Policy"). (Doc. 20 at ¶ 10; Doc. 20-3). The Policy has a per occurrence SIR of $500,000, with limits of $2,500,000 per occurrence and $5,000,000 aggregate. (Doc. 20 at ¶ 11; Doc. 20-3 at 7). The SIR "applies separately to each and every 'occurrence' and offense covered under this Coverage Part." (Doc. 20 at ¶ 18; Doc. 20-3 at 22). The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 20 at ¶ 14; Doc. 20-3 at 25).

The Policy provides that Evanston will only pay an "ultimate net loss" exceeding the $500,000 per occurrence SIR. (Doc. 20 at ¶ 12; Doc. 20-3 at 11). An endorsement amends the definition of "ultimate net loss" to exclude "claim expenses," which are expenses incurred in investigating, adjusting, defending, or settling claims. (Doc. 20 at ¶ 16; Doc. 20-3 at 27, 54). This endorsement states, "The definition of 'ultimate net loss' is amended to remove reference to 'claim expenses' and as a result, 'claim expenses' will not be included in the calculation of 'ultimate net loss.'" (Doc. 20 at ¶ 19; Doc. 20-3 at 54). As amended, "ultimate net loss" means the total amount of damages "awarded in favor of third parties that the insured is legally liable to pay because of 'bodily injury', 'property damage' or 'personal and advertising injury.'" (Doc. 20 at ¶ 12; Doc. 20-3 at 27).

The Policy was also endorsed to include a $500,000 Annual Aggregate Deductible ("AAD") in addition to the $500,000 per occurrence SIR:

> Our obligation to pay "ultimate net loss" in excess of the Self-Insured Retention under this policy does not apply until you have paid the full amount of the Annual Aggregate Deductible shown in the Schedule above. The Annual Aggregate Deductible applies to all "ultimate net loss" in excess of the Self-Insured Retention, regardless of the number of Coverage Parts attached to this policy, insureds, claims ("claims") made or "suits" brought.

> The Annual Aggregate Deductible is not considered a part of the Self-Insured Retention and does not accrue to the exhaustion of the Self-Insured Retention or Annual Aggregate Self-Insured Retention, if applicable.

(Doc. 20-3 at 53). Reading these provisions together, BSO must exhaust a $500,000 per occurrence SIR and the separate $500,000 AAD to trigger Evanston's obligation to pay an ultimate net loss in connection with a covered occurrence. Claim expenses can exhaust the SIR, but not the AAD. (Doc. 20-3 at 53). The AAD is exhausted only by judgments and settlements exceeding the SIR. (Doc. 20-3 at 53).

BSO alleged it was unclear whether the Parkland Shooting Incident was one occurrence, such that it must exhaust only one $500,000 SIR, or multiple occurrences, such that it must exhaust a separate $500,000 for each victim who made a claim, to potentially trigger Evanston's duty to pay an ultimate net loss exceeding the SIR and AAD. (Doc. 20 at ¶¶ 27–30).

C.     The *Koikos* Decision.

The parties' dispute turns primarily on competing interpretations of the *Koikos* decision, which BSO cited in its amended complaint. (Doc. 20 at ¶ 22). In *Koikos*, the insured leased its property to a fraternity for a party. 849 So. 2d at 264–65. Two patrons attempted to enter the restaurant but were turned away after arguing with fraternity members collecting the admission charge. *Id.* at 265. The two rejected patrons returned minutes later, after which a fight broke out. *Id.* One of the patrons pulled out a firearm and shot two victims in short succession, both of whom were struck by separate, single bullets. *Id.*

The victims filed negligent security lawsuits against the insured, who in turn filed a declaratory relief action against its insurer. *Id.* The insured argued that the incident constituted two separate occurrences such that the insurer must indemnify it for up to $500,000 per occurrence ($1,000,000 total), while the insurer argued that the shooting constituted a single occurrence for which it was liable up to a maximum of $500,000. *Id.* This Court certified a question to the Florida Supreme Court, which was rephrased by that Court as follows:

> WHEN THE INSURED IS SUED BASED ON NEGLIGENT FAILURE TO PROVIDE ADEQUATE SECURITY ARISING FROM SEPARATE SHOOTINGS OF MULTIPLE VICTIMS, ARE THERE MULTIPLE OCCURRENCES UNDER THE TERMS OF AN INSURANCE POLICY THAT DEFINES OCCURRENCE AS "AN ACCIDENT, INCLUDING CONTINUOUS OR REPEATED EXPOSURE TO

SUBSTANTIALLY THE SAME GENERAL HARMFUL CONDITIONS"?

*Id.* at 264.

The Florida Supreme Court answered that question affirmatively and ruled that the shooting incident constituted two separate occurrences. *Id.* The Court adopted the cause theory, which focuses on the cause of the injuries, as opposed to the effect theory, which focuses on the number of injured plaintiffs. *Id.* at 269. The Court then considered whether the cause of the injuries was the perpetrator's gunshots or the defendant's alleged negligence. *Id.* Relying on lower court precedent construing separate gunshots as separate occurrences, the Court held that "[i]t is the act that causes the damage, which is neither expected nor intended from the standpoint of the insured, that constitutes the 'occurrence.'" *Id.* at 271.

The Court commented that *if* the insurer's interpretation was reasonable, "the insurance policy *would be* considered ambiguous because the relevant language *would be* susceptible to more than one reasonable interpretation—one providing coverage and the other limiting coverage." *Id.* at 271 (emphasis added). The Court then reiterated its holding "consistent with the 'cause theory,' that in the absence of clear language to the contrary, when the insured is being sued for negligent failure to provide security, 'occurrence' is defined by the immediate injury-producing act and not by the underlying tortious omission." *Id.*

The insurer alternatively argued that even if "occurrence" focuses on the injury-causing act, the incident was one occurrence because the gunshots were fired in quick succession. *Id.* at 272. The Court quickly rejected this argument, reasoning that it would create an unworkable standard focusing on arbitrary time intervals. *Id.*

The Court also explained that the insurer could have included policy language aggregating separate but related occurrences as one occurrence. *Id.* It cited other authorities finding that separate occurrences were treated as one occurrence due to this aggregate or related occurrence language. *Id.* at 272–73. The Court explained that, unlike in those cases, the policy at issue contained no language unambiguously grouping related occurrences together, so it would construe the language in favor of the insured and treat the occurrences as separate. *Id.* at 273.

The Court reached its decision by applying the cause theory to the plain language of the policy:

> We emphasize that we reach our decision by looking at the language of the policy in a manner consistent with precedent regarding the construction of insurance policies in this State. We look not to the number of injuries or victims, i.e., we do not apply the "effect theory," but rather we focus, under the "cause theory," on the independent *immediate* acts that gave rise to the injuries and Koikos's liability.

*Id*. Therefore, the Court answered the certified question affirmatively and held that the two shootings constituted two separate occurrences. *Id.*

**D.    Evanston's Motion to Dismiss.**

Evanston moved to dismiss BSO's complaint, arguing the Parkland Shooting Incident constituted multiple occurrences. (Doc. 21). The Policy's definition of occurrence is identical to that in *Koikos*: "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 20-3 at 25). Evanston argued, consistent with *Koikos*, that the Parkland Shooting Incident resulted in multiple separate occurrences such that BSO must exhaust a separate $500,000 SIR for each victim. (Doc. 21 at 8).

BSO, on the other hand, interpreted *Koikos* as holding that the shootings were separate occurrences solely because it found that term ambiguous and construed it in the insured's favor. (Doc. 23 at 6–7). BSO contended that the Policy's definition was likewise ambiguous, which compelled the opposite result reached in *Koikos* because, unlike the insured in that case, BSO favored a determination that the Parkland Shooting Incident resulted in only one occurrence. (Doc. 23 at 8–9).

The district court denied Evanston's motion to dismiss. (Doc. 38). The district court ruled that *Koikos* was decided on ambiguity grounds, not because the shootings were multiple occurrences based on the cause theory:

> [T]he term "occurrence" within the meaning of the Policy is ambiguous as applied to the facts in this case, as it reasonably can be interpreted to mean either the entire shooting spree by Cruz or each shot he fired that resulted in separate injuries to a separate victim. Applying *Koikos* and its progeny, because BSO favors the Parkland

11

> Shooting Incident to be a single "occurrence" under the Policy, that is the interpretation this Court adopts under Florida's well-settled principles of insurance policy interpretation, which require ambiguity in an insurance policy to be construed in favor of the insured.

(Doc. 38 at 18). The district court declined to follow this Court's post-*Koikos* decisions, reasoning that they contradicted *Koikos*. (Doc. 38 at 13–14).

### E.     BSO's Sophisticated Insurance Program.

The parties then conducted discovery regarding BSO's insurance program and coverage history. John Greene serves as the director of BSO's risk management department, a division of the general counsel's office. (Doc. 90-7 at 2). Greene testified that the risk management department procures insurance and adjusts claims against BSO. (Doc. 90-7 at 3–4). BSO has approximately 5,600 employees, including lawyers and support staff, and its annual budget exceeds one billion dollars. (Doc. 90-7 at 9). Due to its size, BSO has significant bargaining power with respect to its insurance programs and coverage. (Doc. 91 at ¶ 12).

For nearly 20 years, BSO engaged Marsh—the largest international insurance broker—to assist with procuring and negotiating insurance policies. (Doc. 90-7 at 5; Doc. 90-12; Doc. 90-13). Marsh has a specialized department devoted to public agencies like BSO. (Doc. 91 at ¶ 10). Marsh assigned a team of brokers to BSO's account, and they ensured that policies were written in BSO's best interests. (Doc. 90-7 at 13; Doc. 90-18 at 6–7).

To that end, Marsh negotiated policies on BSO's behalf and often requested changes to terms, limits, and premiums. (Doc. 90-7 at 13–14). Marsh and BSO held a monthly conference call to discuss the insurance program. (Doc. 90-20). Marsh prepared strategy documents for BSO to consider before renewing policies, including the subject Policy. (Doc. 90-21).

Under its insurance program, BSO hires its own counsel and controls the defense of its claims. (Doc. 90-7 at 5; Doc. 91 at ¶ 9). As a state agency, BSO enjoys sovereign immunity pursuant to section 768.28, Florida Statutes, which caps its liability for negligence claims at $200,000 per person and $300,000 per incident, regardless of the number of claims stemming from an incident. (Doc. 90-7 at 6). But some claims, like excessive force or other civil rights violations, are not subject to the sovereign immunity damage caps. (Doc. 90-7 at 6).

BSO carries excess insurance largely to address those claims for which it receives no immunity. (Doc. 90-7 at 6). This arrangement benefits BSO because it pays lower premiums and controls the defense of claims while ceding some risk to excess carriers. (Doc. 90-26 at 4–5; Doc. 91 at ¶ 7). BSO is well versed in sovereign immunity law, which arises in nearly all litigation against it. (Doc. 90-7 at 12).

The Parkland Shooting Incident spawned 60 lawsuits against BSO. (Doc. 90-7 at 12). Greene testified that these lawsuits all allege negligence for which BSO is entitled to the damage caps. (Doc. 90-7 at 6). After the Parkland Shooting Incident,

Greene emailed Evanston to advise that BSO's liability would not exceed $300,000, and thus Evanston's Policy "should not be touched unless something crazy turns up." (Doc. 90-56 at 1).

The only way for the Parkland Shooting Incident victims to obtain more than the $200,000/$300,000 cap is through a claims bill authorized by the Florida Legislature. (Doc. 90-7 at 6). If that occurs, the State of Florida—not BSO or Evanston—pays the victims directly. (Doc. 90-7 at 6). No Parkland Shooting Incident victims have petitioned for a claims bill because they must first obtain a judgment against BSO exceeding the statutory caps. (Doc. 90-7 at 7). BSO has paid no judgments or settlements to the victims. (Doc. 90-7 at 10).

The Parkland Shooting Incident victims reached a $25,000,000 settlement with the Broward County School Board. (Doc. 90-7 at 11). Greene agreed that since the School Board is also a state agency, its settlement should reduce BSO's liability to $0 based on section 768.28(5), Florida Statutes. (Doc. 90-7 at 11–12).

F. **The State National Litigation.**

BSO litigated a similar insurance coverage action against its prior excess policy insurer, State National Insurance Company. BSO was sued in connection with its mass arrest of demonstrators at the Free Trade of the Americas ("FTAA") meetings. *State Nat'l Ins. Co. v. Lamberti*, 2009 WL 764501, at *1 (S.D. Fla. Mar. 20, 2009). The parties disputed how many occurrences resulted from the incident,

which would dictate how many separate $500,000 per occurrence SIRs BSO had to exhaust. *Id.* at *6. BSO argued that the incident was one occurrence, while State National argued it was multiple. *Id.* The parties did not ask the court to determine the precise number of occurrences, only whether it was more than one. *Id.*

The district court determined that the incident resulted in separate occurrences subject to separate SIRs. *Lamberti*, 2009 WL 764501, at *7–8. This Court affirmed, holding that "under Florida law, the FTAA claims represent more than one occurrence under the policy." *State Nat'l Ins. Co. v. Lamberti*, 362 F. App'x 76, 82 (11th Cir. 2010).

## G. BSO's Predecessor Policy.

Lexington Insurance Company provided BSO excess coverage from 2008 until 2016. (Doc. 90-7 at 11; Doc. 90-25 at 1). The 2015–2016 policy established a $2,500,000 per occurrence limit and $5,000,000 aggregate limit. (Doc. 91-1 at 4). The policy had a $500,000 SIR per occurrence, which it defined as "an accident, including continuous, repeated, or related exposure to substantially the same general harmful conditions." (Doc. 91-1 at 4, 10).

Unlike BSO's prior excess policy with State National, the Lexington policy contained an Application of Retained Limit and Limits of Insurance Amendment (Endorsement #003). (Doc. 91-1 at 31). This endorsement provided that only one $500,000 SIR would apply to a "single event," which it defined to include a "series

of continuous, repeated, or related occurrences . . . arising out of the same related facts or circumstances regardless of the number of Insureds, claimants, claims made or suits brought." (Doc. 91-1 at 31). The declarations page incorporated the endorsement by listing the $500,000 SIR and stating it applies to "[a]ny one occurrence . . . or related occurrences." (Doc. 91-1 at 4).

During renewal negotiations, Lexington sought to double BSO's premium for the same policy language. (Doc. 90-7 at 11; Doc. 90-28 at 3; Doc. 90-29; Doc. 91 at ¶ 14; Doc. 91-2 at 1). This surprised BSO and Marsh because they anticipated an increase of between only 5 and 10%. (Doc. 90-7 at 11; Doc. 90-27 at 2). Faced with this significant increase, BSO directed Marsh to seek excess coverage elsewhere. (Doc. 90-31; Doc. 90-32; Doc. 90-50).

Marsh obtained a quote from Evanston for nearly half of Lexington's quoted premium. (Doc. 90-32; Doc. 90-33). BSO ultimately accepted Evanston's quote, which included the same $2,500,000/$5,000,000 policy limits and $500,000 per occurrence SIR as the Lexington policy. (Doc. 90-33; Doc. 90-34). The parties also agreed to add the $500,000 AAD provision in addition to the per occurrence SIR. (Doc. 91 at ¶¶ 14–15).

The Evanston policy, issued after the Lexington policy, contained no endorsement or other language, like that in the Lexington policy, expressly applying one SIR to separate but related occurrences. (Doc. 91 at ¶ 20). While BSO and Marsh

negotiated the policy terms and requested several endorsements and other changes, Greene agreed that they never sought a related occurrence endorsement or other similar language. (Doc. 90-7 at 13; Doc. 91 at ¶¶ 21–23). Marsh acknowledged that BSO "saved a lot of money" based on the differences between the Lexington and Evanston policies. (Doc. 90-53).

### H. The Subject Policy.

During the 2016-2017 policy term, BSO and Marsh began discussing their renewal strategy. The parties agreed to several policy modifications but never addressed the standard "occurrence" definition. (Doc. 90-36; Doc. 90-37; Doc. 90-38; Doc. 91-4; Doc. 91-5). Before executing the subject renewed Policy, Marsh provided BSO with a copy for its review. (Doc. 90-39). Marsh requested that BSO verify the limits of liability, policy terms, and exclusions, and inform Marsh within 30 days of any issues. (Doc. 90-39).

Neither BSO nor Marsh requested an amendment or endorsement to establish a single retained limit for related occurrences. (Doc. 91 at ¶ 22). BSO and Marsh could have negotiated for that language when switching from Lexington to Evanston or renewing the original Evanston policy. (Doc. 91 at ¶¶ 21–23). Evanston would have considered that request, but likely would have charged an additional premium to account for the change had it been asked to do so. (Doc. 91 at ¶ 23).

## I.    Motions for Summary Judgment.

BSO and Evanston filed competing motions for final summary judgment. (Doc. 88; Doc. 93). Evanston first argued that BSO improperly sought an advisory opinion. (Doc. 93 at 2–3). BSO neither pleaded nor proved that it incurred amounts constituting an ultimate net loss, i.e., exceeding the $500,000 per occurrence SIR and $500,000 AAD. (Doc. 93 at 3). Until BSO satisfied these conditions of coverage, the issue of whether it had to exhaust more than one SIR remained premature and hypothetical as BSO may never make a claim for indemnity regardless of the answer to that question. (Doc. 93 at 3–4).

Second, Evanston argued that the Parkland Shooting Incident could not trigger the Policy because Evanston is only liable to pay an "ultimate net loss" after BSO satisfied the $500,000 SIR and $500,000 AAD. (Doc. 93 at 4). Claim expenses can exhaust the SIR, but not the AAD, which must be exhausted solely by payment of judgments and settlements. (Doc. 93 at 4). Given BSO's admission that sovereign immunity limits its liability to $300,000, it could not exhaust the SIR and AAD through claims arising from the Parkland Shooting Incident. (Doc. 93 at 5–6). Because BSO did not, and could not, incur an "ultimate net loss" exceeding the $500,000 SIR and $500,000 AAD with respect to the Parkland Shooting Incident, Evanston was entitled to judgment in its favor. (Doc. 93 at 8).

Third, Evanston argued that the Parkland Shooting Incident constituted multiple separate occurrences. (Doc. 93 at 8). Evanston emphasized that *Koikos* found the shootings at issue resulted in multiple occurrences as a matter of law based on the cause theory, not because it found "occurrence" ambiguous. (Doc. 93 at 9). The Court's reference to ambiguity in dicta as an alternative basis for relief did not usurp its unequivocal holding that each gunshot injuring a victim was a separate occurrence. (Doc. 93 at 9–10). Evanston argued that the Parkland Shooting Incident similarly resulted in multiple occurrences. (Doc. 93 at 11–17).

Lastly, even if *Koikos* permitted a determination that "occurrence" was ambiguous, Evanston argued that *contra proferentem* did not apply because BSO was a sophisticated insured. (Doc. 93 at 18). The Policy was not an adhesion contract, but rather the result of an arms-length negotiation between Evanston, BSO, and Marsh. (Doc. 93 at 19–20). BSO knowingly accepted a policy without a related occurrence endorsement, likely to lower its premium. (Doc. 93 at 22). Evanston argued the district court should not construe the Policy against it but should instead consider extrinsic evidence showing that the parties intended not to aggregate related occurrences into one occurrence like BSO had done with Lexington in the policy immediately preceding Evanston's policy. (Doc. 93 at 26).

BSO responded that the parties had a ripe controversy because BSO incurred more than $500,000 in defense costs in connection with the Parkland Shooting

Incident. (Doc. 100 at 4). BSO also claimed that it exhausted the $500,000 AAD by payment of claim expenses and judgments or settlements in unrelated claims in the same policy year. (Doc. 100 at 4). BSO relied on a declaration from Greene, who attached a ledger showing the amount of defense costs and judgments/settlements paid in other claims. (Doc. 99 at ¶ 7; Doc. 99-2). Greene identified no claim in which BSO paid claim expenses ("Paid Legal") and judgments or settlements ("Paid BI/Liability") exceeding $500,000 combined. (Doc. 99-2).

BSO next argued that "occurrence" was ambiguous based on *Koikos*. (Doc. 100 at 11). According to BSO, *Koikos* held that the insured and insurer both offered reasonable interpretations of that term, and the Florida Supreme Court construed it against the insurer. (Doc. 100 at 11–12). BSO concluded that the Parkland Shooting Incident must "be construed as a single occurrence under the Policy because that is the reasonable interpretation favored by the insured, BSO." (Doc. 100 at 16).

BSO further contended that Florida law applied *contra proferentem* even when a sophisticated insured negotiated the policy's terms. (Doc. 100 at 16). BSO argued that it did not draft the definition of "occurrence," and therefore, the term must be construed against Evanston. (Doc. 100 at 17). BSO urged the district court not to consider evidence showing the history of its excess policies and removal of the related occurrence endorsement from the predecessor policy. (Doc. 100 at 18).

Evanston replied that the AAD cannot be satisfied by payment of claim expenses. (Doc. 104 at 2). Therefore, evidence that BSO paid more than $1,000,000 in defense costs arising from the Parkland Shooting Incident was irrelevant; the AAD must be satisfied by payment of judgments and settlements *exceeding* the $500,000 per occurrence SIR. (Doc. 104 at 3). Greene identified no claim in which BSO paid more than a combined $500,000 in defense costs, settlements, or judgments. (Doc. 99-2 at 6–13; Doc. 104 at 4). Thus, none of these claims contributed towards exhausting the AAD during this policy year. (Doc. 104 at 4).

**J.     Omnibus Summary Judgment Order.**

The district court entered an omnibus order granting BSO's motion for summary judgment and denying Evanston's competing motion. (Doc. 110). The district court found that the parties had a justiciable controversy because resolution of their dispute would determine whether BSO had to exhaust one SIR or a separate SIR for each victim. (Doc. 110 at 9–10).

The district court reiterated its prior ruling that the term "occurrence" was ambiguous based on *Koikos*. (Doc. 110 at 10). Therefore, the district court construed that term in BSO's favor, rejecting Evanston's argument that *contra proferentem* did not apply due to BSO's sophisticated nature and active involvement in negotiating the Policy. (Doc. 110 at 11–12).

**K.      Final Judgment and Appeal.**

The district court separately entered final judgment for BSO "declaring that the Parkland Shooting Incident constitutes a single 'occurrence' under the Policy and that BSO must exhaust a single SIR of $500,000 under the Policy." (Doc. 111 at 1). This appeal followed. (Doc. 114).

## SUMMARY OF THE ARGUMENT

The district court erred in granting BSO's motion for summary judgment and denying Evanston's competing motion. First, the district court lacked jurisdiction to issue an advisory opinion to address circumstances that likely will never materialize. BSO sought a declaration as to how the court would interpret "occurrence" without first showing that it satisfied the conditions for coverage by exhausting the SIR and AAD. The Parkland Shooting Incident cannot independently trigger coverage because BSO's liability cannot exceed $300,000. The district court should not have exercised jurisdiction to address a hypothetical future claim for excess coverage.

Second, the district court misinterpreted *Koikos* and overlooked its principal holding that, under the cause theory, multiple victim shooting incidents result in multiple occurrences. This Court interpreted *Koikos* on numerous occasions, but it never found the same, standard occurrence language ambiguous. The district court erred by expressly declining to follow this Court's decisions and instead focusing on dicta in *Koikos* regarding ambiguity. This Court should apply the cause theory and hold that the Parkland Shooting Incident constitutes multiple occurrences subject to separate $500,000 SIRs as a matter of law, consistent with its prior decisions.

Third, even if this Court finds that the district court properly found "occurrence" ambiguous, it nonetheless erred by construing that term in BSO's favor. *Contra proferentem* does not apply when a sophisticated insured stands on an

even playing field with the insurer and negotiates the coverage terms. BSO is self-insured, works with international insurance brokers, and actively participates in the procurement and renewal of its insurance policies. Rather than construing the Policy in BSO's favor and accepting its proposed interpretation, the district court should have considered evidence showing that BSO and Evanston intended for losses like the Parkland Shooting Incident to constitute multiple separate occurrences by removing a related occurrence endorsement from the predecessor policy.

For these reasons, this Court should reverse the final judgment and remand for entry of final judgment for Evanston.

# ARGUMENT

## I. Standard of Review.

This Court reviews de novo a district court's ruling on cross motions for summary judgment. *Goldfarb v. Reliance Standard Life Ins. Co.*, 106 F.4th 1100, 1105 (11th Cir. 2024). The de novo standard also applies to a district court's interpretation of an insurance contract. *State Farm Mut. Auto. Ins. Co. v. Spangler*, 64 F.4th 1173, 1178 (11th Cir. 2023).

When interpreting an insurance policy, the court starts with "the plain language of the policy, as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (citation omitted). The court must give effect to the language as written. *Allstate Ins. Co. v. Orthopedic Specialists*, 212 So. 3d 973, 976 (Fla. 2017). The fact an insurance policy is complex or requires analysis does not render it ambiguous. *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010). The general rule requiring liberal construction in the insured's favor "applies only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction." *Synergy Contracting Grp., Inc. v. People's Tr. Ins. Co.*, 391 So. 3d 505, 508 (Fla. 2d DCA 2024) (quoting *People's Tr. Ins. Co. v. Restoration Genie, Inc.*, 336 So. 3d 332, 335 (Fla. 4th DCA 2022)).

**II.    The District Court Lacked Jurisdiction Under The Declaratory Judgment Act.**

The district court erred in determining that the parties had a ripe case or controversy because BSO neither alleged nor proved that the contingencies necessary for coverage under Evanston's excess Policy occurred. BSO instead sought an advisory opinion on how to interpret the Policy in the event it potentially sought coverage in the future. Evanston has no duty to provide coverage unless and until BSO exhausts the SIR and AAD, which it has not. Absent satisfaction of those conditions, the district court should not have exercised jurisdiction to answer BSO's question regarding a hypothetical future claim for insurance coverage.

**A.    The Declaratory Judgment Act.**

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . a court of the United States upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

The plaintiff must establish "that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1247, 1251 (11th Cir. 2008) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In that respect, the Act echoes the requirement of Article III

standing. *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019).

The parties' controversy must require "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Owners Ins. Co. v. Parsons*, 610 F. App'x 895, 897 (11th Cir. 2015) (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241 (1937)). A party cannot merely seek "legal advice by the courts or the answer to questions propounded from curiosity." *Santa Rosa Cnty. v. Admin. Comm'n, Div. of Admin. Hearings*, 661 So. 2d 1190, 1193 (Fla. 1995) (citation omitted).

**B.    The Policy's Conditions of Coverage.**

Evanston's Policy provides coverage for an "ultimate net loss" exceeding the $500,000 SIR. The SIR is exhausted by judgments, settlements, and claim expenses—like attorney's fees and investigatory costs. An endorsement amends "ultimate net loss" to eliminate "claim expenses" from that definition: "[t]he definition of 'ultimate net loss' is amended to remove reference to 'claim expenses' and as a result, 'claim expenses' will not be included in the calculation of 'ultimate net loss.'" (Doc. 20 at ¶ 19; Doc. 20-3 at 54). As amended, an "ultimate net loss" is the total amount of damages "awarded in favor of third parties that the insured is legally liable to pay because of 'bodily injury', 'property damage' or 'personal and advertising injury.'" (Doc. 20 ¶ 12; Doc. 20-3 at 27).

The Policy also establishes a $500,000 AAD that must be satisfied by payment

of an ultimate net loss—judgments or settlements—exceeding the SIR:

> Our obligation to pay "ultimate net loss" in excess of the Self-Insured Retention under this policy does not apply until you have paid the full amount of the Annual Aggregate Deductible shown in the Schedule above. The Annual Aggregate Deductible applies to all "ultimate net loss" in excess of the Self-Insured Retention, regardless of the number of Coverage Parts attached to this policy, insureds, claims ("claims") made or "suits" brought.

> The Annual Aggregate Deductible is not considered a part of the Self-Insured Retention and does not accrue to the exhaustion of the Self-Insured Retention or Annual Aggregate Self-Insured Retention, if applicable.

(Doc. 20-3 at 53). Read together, these provisions require BSO to satisfy a $500,000

SIR for each occurrence, which can be exhausted by claim expenses, judgments, or

settlements. BSO must separately exhaust a $500,000 AAD, which can be satisfied

by aggregating judgments and settlements in separate claims that exceed the

$500,000 per occurrence SIR for that particular claim.

For example, consider a scenario in which BSO is sued in three cases. In each

case, BSO incurs $500,000 in claim expenses (which can be used to satisfy the SIR)

and pays a $200,000 judgment. Each judgment constitutes an "ultimate net loss"

because it exceeds the SIR. Therefore, $500,000 of those $600,000 in judgments

applies towards satisfying the AAD. Evanston would then provide BSO $100,000 in

coverage—an ultimate net loss exceeding the SIR and AAD. Having been satisfied,

the AAD would dissipate and not apply to any future claims in the same policy

period. Thus, any future ultimate net losses exceeding the SIR would be covered "ultimate net losses," subject to the Policy limits.

## C. The Parkland Shooting Incident Cannot Trigger Coverage.

The district court erred in determining that the Parkland Shooting Incident can independently trigger coverage. BSO admits that it faces maximum liability of $300,000 in total for all claims arising from the Parkland Shooting Incident pursuant to section 768.28(5), Florida Statutes. And even that limited exposure remains speculative at best because BSO disputes liability and has neither settled any claims nor received any adverse judgments arising from the Parkland Shooting Incident. Moreover, BSO acknowledged that because the Broward County School Board is also a state agency, its $25,000,000 settlement with the victims should reduce BSO's potential liability to $0. *See id*.

There are only two circumstances in which BSO's liability could exceed the damage caps, neither of which trigger coverage under Evanston's Policy. First, the Parkland Shooting Incident victims could petition the Florida Legislature for a claims bill, a process by which the Legislature appropriates an amount to pay the victims directly. *See* §§ 11.066, 768.28(5), Fla. Stat. The victims must first obtain a judgment against BSO exceeding the caps, which has not occurred. In any event, a claims bill authorizes recovery against the government directly, not BSO or Evanston. *See Plancher v. UCF Athletics Ass'n, Inc.*, 175 So. 3d 724, 729 (Fla. 2015)

(explaining that plaintiffs "must look to the Legislature to collect any amount awarded above the statutory cap").

Second, section 768.28 allows a state agency to settle a claim "within the limits of insurance coverage provided." § 768.28(5), Fla. Stat. The Policy's "Government Immunity" provision states, however, that Evanston "will not waive, either in the adjustment of claims ('claims') or in the defense of 'suits' against the insured, any governmental immunity of the insured." (Doc. 20-3 at 5). While BSO could potentially choose to waive immunity and voluntarily pay a settlement above the statutory caps, it cannot seek coverage from Evanston for that settlement. Once again, this is a purely hypothetical scenario because BSO has not paid, and may never pay, any judgment or settlement to the Parkland Shooting Incident victims.

The district court misinterpreted the law and Evanston's Policy in ruling that the Parkland Shooting Incident itself could trigger coverage. BSO presented evidence that it exhausted one SIR by paying more than $500,000 in attorneys' fees in connection with the incident. But even if the SIR is exhausted, BSO cannot become liable for more than a $300,000 settlement or judgment. This $300,00 maximum potential "ultimate net loss" cannot independently satisfy the $500,000 AAD. Therefore, whether the Parkland Shooting Incident resulted in one or multiple occurrences is irrelevant unless BSO exhausts the AAD by paying judgments and settlements exceeding the SIR on other covered claims.

## D. BSO Did Not Satisfy the AAD.

Perplexingly, the district court found it is "undisputed in the record that BSO has already exhausted the separate $500,000 AAD by payment of covered judgments or settlements during the applicable period for the Policy." (Doc. 110 at 9). The district court cited Evanston's response to BSO's factual assertion in that regard, wherein Evanston stated, "Disputed. This statement is also immaterial as BSO must first demonstrate that it has satisfied the self-insured retention with respect to every claim or occurrence before it can apply any amounts paid in judgments or settlements to the AAD." (Doc. 106 at ¶ 84). Evanston clearly contested BSO's allegation.

In fact, BSO's own evidence contradicts its claim. Greene attested that BSO paid more than $1,000,000 in settlements and judgments, but none of those payments contributed towards satisfying the AAD. Greene attached a ledger identifying all claims during the Policy period. (Doc. 99-2). The ledger has four columns: Coverage (the type of claim), Paid Legal (claim expenses), Paid BI/Liability (judgments and settlements), and the Paid Total.

For a settlement or judgment to contribute towards the AAD, BSO must have also incurred at least $500,000 total in claim expenses, judgments, or settlements to exhaust the SIR on that claim. This ledger shows that there are *no claims* in which the combined total of Paid Legal and Paid BI/Liability exceeds $500,000. (Doc. 99-2). Consequently, none of the indemnity BSO paid on these claims contributed

towards exhausting the AAD. The district court erred in accepting Greene's statement that BSO satisfied the AAD as true when his own ledger proves otherwise. BSO remained within its self-insured limits for all claims Greene identified on this ledger during the Policy period.

The district court also improperly ignored that the AAD had not been satisfied on the basis that it would be inequitable to require BSO to potentially pay "tens of millions of dollars before being entitled to any coverage under the Policy." (Doc. 110 at 9). The district court lost sight of the fact that Evanston provides excess insurance, not primary insurance. BSO has an annual budget exceeding one billion dollars, which is why it is self-insured and has excess insurance primarily to address claims for which it does not receive immunity. Greene explained that if a plaintiff "can prove 1983 claims, then that opens up the cap. Then they can collect from the excess carrier up to the applicable insurance." (Doc. 90-7 at 6).

Indeed, a single claim under 28 U.S.C. § 1983, which may not be subject to immunity, could result in BSO paying a judgment of over $1,000,000. That judgment alone would exhaust both the SIR for that occurrence and the AAD for the entire Policy period. *See, e.g.*, *Salvato v. Blair*, 2014 WL 12639958, at *4 (M.D. Fla. June 30, 2014) (entering $2,263,014 judgment against judgment against county sheriff on § 1983 claim). The Policy certainly is not illusory or inequitable as the district court suggested. BSO simply failed to demonstrate that any such claims

exhausted the AAD during the Policy period.

The district court erred in exercising jurisdiction in the first instance here. BSO failed to show that the Parkland Shooting Incident could result in an ultimate net loss exceeding the SIR and AAD. Evanston's potential excess coverage obligation is purely hypothetical and requires numerous contingencies that may never occur. *See Balarezo Family Chiropractic, LLC v. State Farm Mut. Auto. Ins. Co.*, 2024 WL 1343178, at *1 (S.D. Fla. Feb. 12, 2024) (dismissing declaratory action regarding potential litigation with its insurer that had not commenced); *Progressive Am. Ins. Co. v. Eres*, 2016 WL 8999461, at *2 (M.D. Fla. Apr. 4, 2016) (dismissing declaratory judgment action concerning insurer's potential bad faith). This Court should reverse the final judgment in favor of BSO.

## III.    The Parkland Shooting Incident Constitutes Multiple Occurrences.

The district court erred by misinterpreting *Koikos* and determining the defined term "occurrence" to be ambiguous. In *Koikos*, the Florida Supreme Court ruled that the shootings resulted in multiple occurrences as a matter of law, not because the same policy language at issue here was ambiguous. *Koikos* and this Court's precedent interpreting that decision compel the conclusion that the Parkland Shooting Incident constitutes multiple separate occurrences, each subject to a separate $500,000 SIR.

## A. *Koikos* Did Not Rule on Ambiguity Grounds.

The district court erred in substituting dicta in *Koikos* for its holding. This Court asked the Florida Supreme Court to clarify whether separate shootings result in separate occurrences when the insured is sued for negligent security. The Florida Supreme Court provided that clarification, concluding that "under the terms of the general liability policy at issue in this case, each shooting of a separate victim constitutes a separate occurrence." *Koikos*, 849 So. 2d at 265.

Neither the certified question nor the Court's unequivocal answer reference ambiguity. In fact, had the Florida Supreme Court ruled on ambiguity grounds, it could not have answered the certified question without reservation because the outcome in future cases would depend on what interpretation of "occurrence" the insured preferred. The Court intended to settle this issue, not leave it open for interpretation in future cases involving substantially similar facts.

The district court's narrow focus on dicta regarding ambiguity misses the forest for the trees. The insurer in *Koikos* raised two interpretations to support its argument that the incident resulted in only one occurrence: (1) the insured's negligence, not the gunshots, was the occurrence; and (2) the separate gunshots were one occurrence because they were fired almost concurrently. The Florida Supreme Court made clear that it rejected both of those interpretations of "occurrence" as unreasonable. That ruling precluded application of *contra proferentem*, which

requires construction in favor of the insured only when the parties offer "two reasonable interpretations, one providing coverage and the other excluding coverage." *Gov't Emps. Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017) (quoting *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005)).

That is precisely why the Court stated that "even if" the insurer's interpretation was reasonable, the policy "would be considered ambiguous." *Koikos*, 849 So. 2d at 271. The Court simply pointed out that an alternative ruling based on ambiguity would not change the result: separate shootings are separate occurrences.

The Court's other reference to ambiguity appeared in the majority opinion's penultimate paragraph, in which it addressed the fact that the policy contained no aggregate or related occurrence language that would group otherwise separate occurrences together as one occurrence. *Id.* at 273. Since the policy lacked "unambiguous language" providing that a "'series of similar cause would be one occurrence," the Court construed that term in favor the insured. *Id.*

The Court recognized that the insurer could have, but did not, include related occurrence language modifying the standard occurrence definition. But that language would only become relevant if the incident resulted in separate occurrences in the first instance. In other words, if the entire incident was one occurrence, there would be no separate, but related, occurrences to aggregate together into one.

Because the Court already ruled the shots were separate occurrences as a

matter of law, the *Koikos* Court held that additional policy language would be necessary if the insurer desired to group those separate, but related, occurrences into one occurrence. The fact that other policies include related occurrence language only further underscores that, absent such language, Florida law provides that separate injury-causing acts result in separate occurrences. Indeed, BSO had a related occurrence endorsement in its Lexington policy, but not Evanston's Policy.

Taken in context with the entire opinion, the Florida Supreme Court's limited statements regarding ambiguity do not usurp its principal holding based on the cause theory. This conclusion is further bolstered by the fact that the Court relied on existing Florida precedent finding that similar multiple-victim shooting events resulted in multiple occurrences as a matter of law. *See N.H. Ins. Co. v. RLI Ins. Co.*, 807 So. 2d 171, 172 (Fla. 3d DCA 2002) ("As the trial court properly found, there were three 'occurrences' here. The aggressor fired three shots, at separate times, and injured three separate persons, killing two."); *Am. Indem. Co. v. McQuaig*, 435 So. 2d 414, 416 (Fla. 5th DCA 1983) (similar).

Had the Florida Supreme Court decided *Koikos* on ambiguity grounds, it would have receded from these prior decisions finding the same language unambiguous. To the contrary, the Court fully adopted their reasoning. In forty years since *McQuaig*, this is the *only case* in which a court applying Florida law has ruled that a multiple victim shooting incident spawning separate negligent security

lawsuits against the insured resulted in only one occurrence. The district court's order represents a significant departure from Florida precedent.

This Court should reject the district court's determination that "occurrence" is ambiguous based on dicta in *Koikos*. The Florida Supreme Court did not leave this issue open for interpretation. The law permits only one reasonable construction of this policy language as applied to the facts of this case: the Parkland Shooting Incident resulted in multiple separate occurrences.

**B.      Courts Do Not Apply *Koikos* Based on Ambiguity.**

The district court further erred by rejecting this Court's decisions interpreting *Koikos*. Had this Court not applied *Koikos* on numerous occasions, perhaps the district court could have interpreted the decision as it saw fit. But the district court should not have disregarded authority that neither this Court nor the Florida Supreme Court has even questioned.

In *Guideone Elite Insurance v. Old Cuter Presbyterian Church, Inc.*, 420 F.3d 1317 (11th Cir. 2005), a perpetrator kidnapped a woman and her children outside a church preschool and committed separate acts of robbery, battery, and sexual assault over a period of several hours. *Id.* at 1321–22. The church's insurer filed a declaratory judgment action, requiring the district court to determine whether the incident was one occurrence or multiple occurrences. *Id.* at 1323. This Court held that the perpetrator's actions "were separated by sufficient 'time and space' so as to

constitute separate occurrences under *Koikos*." *Id.* at 1332. This Court did not find the policy language at issue ambiguous.

This Court reaffirmed its interpretation of *Koikos* in another case involving BSO, *State National Insurance Company v. Lamberti*, 362 F. App'x 76 (11th Cir. 2010), a suit in connection with BSO's mass arrest of protesters. *Id.* at 77–78. BSO urged this Court to find that the arrests were all one occurrence under its excess policy—a predecessor to Evanston's Policy—such that it had to exhaust only one SIR for all claims stemming from the incident. *Id.* at 81. This Court applied *Koikos* and *Guideone*, concluding that the arrests resulted in multiple occurrences because "each interaction with the individual officers is the cause of the claim, and is distinguishable in time and space." *Id.* at 82–83. This Court declined to adopt BSO's proposed interpretation and instead ruled based on the policy's plain language.

This Court went a step further by affirming a district court's ruling expressly rejecting the argument that *Koikos* was decided on ambiguity grounds. *State Nat'l Ins. Co. v. City of Miami*, 2010 WL 11506250, at *1 (S.D. Fla. May 11, 2010). This case also arose, in part, from the same mass arrests confronted in *Lamberti*. *Id.* The City's policy had a $500,000 per occurrence SIR and contained an identical definition of "occurrence" as Evanston's Policy. *Id.* at *2. The parties filed cross motions for summary judgment, disputing whether the incident was one occurrence or multiple occurrences. *Id.* at *4.

The district court rebuffed the City's argument that *Koikos* found the term "occurrence" ambiguous and based its holding on that determination:

> Miami reads *Koikos* incorrectly when it argues that the court interpreted the term "occurrence" to mean each gunshot because the policy was ambiguous and that interpretation favored the restaurant owner. The *Koikos* court never indicated that the policy was ambiguous as to the meaning of the term "occurrence," but only stated that its conclusion would be the same "*even if* [it] accepted [the insurance company's] construction of the policy as a reasonable interpretation.

*Id.* at 5 n.11 (alterations in original). The district court applied *Koikos* and *Lamberti*, ruling that each lawsuit was a separate occurrence subject to a separate $500,000 SIR. *Id.* This Court affirmed "for the reasons set forth" in the district court's order. *State Nat'l Ins. Co. v. City of Miami*, 403 F. App'x 478, 479 (11th Cir. 2010).

Most recently, in *Travelers Indemnity Co. v. Garcia*, 2021 WL 2935425 (11th Cir. July 13, 2021), this Court held that a motor vehicle accident resulted in a single occurrence, despite the insured's argument that this Court "must construe the policy in favor of coverage." *Id.* at *3. Considering *Koikos* and its progeny, this Court rejected that argument and accepted the insurer's position as the only reasonable interpretation of the policy. *Id.*

On every occasion, this Court declined to find the definition of "occurrence" ambiguous. And even where this Court ruled for the insured, it did so because the policy's plain language compelled that result, not because it construed ambiguous

language in the insured's favor. *Mid-Continent Cas. Co. v. Basedo*, 477 F. App'x 702, 709 (11th Cir. 2012) (holding separate faulty repairs over time constituted three occurrences without resort to ambiguity); *Liberty Mut. Fire Ins. Co. v. State Farm Fla. Ins. Co.*, 2022 WL 1025164, at *2 (11th Cir. Apr. 6, 2022) (similar).

Numerous other decisions agree: under Florida law, the cause theory determines how many occurrences result from an incident. *See Belt v. USAA Cas. Ins. Co.*, 312 So. 3d 947, 952 (Fla. 4th DCA 2021) (applying *Koikos* to determine that only one accident occurred without reference to ambiguity); *S. Cent. Educ. Risk Mgmt. Program v. Star Ins. Co.*, 2018 WL 11353289, at *9 (S.D. Fla. Dec. 18, 2018) ("The 'immediate cause' of the damage in a sexual abuse case is each instance of abuse inflicted on the victim, based on binding Florida cases finding multiple occurrences in similar factual scenarios–*Koikos* (multiple gunshots), *GuideOne* (multiple instances of assault) and *Lamberti* (each interaction with a police officer)."); *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, 2009 WL 1953649, at *1 (M.D. Fla. July 6, 2009) (finding property damage from three different hurricanes resulted in "three occurrences, as a matter of law").

The district court erred in declining to follow this precedent. It never even cited or addressed *Guideone*—a binding decision that Evanston cited in its motion for summary judgment as well as other motions and responses. It also cast aside *City of Miami* and *Lamberti*, concluding that this Court misinterpreted *Koikos*. (Doc. 38

at 14). Absent an intervening decision from this Court or the Florida Supreme Court, the district court should not have rejected these decisions.[1] *See EmbroidMe.com, Inc. v. Travelers Prop. Cas. Co. of Am.*, 845 F.3d 1099, 1105 (11th Cir. 2017) ("[W]hen we have issued a precedential decision interpreting that state law, our prior precedent rule requires that we follow that decision, absent a later decision by the state appellate court casting doubt on our interpretation of that law."). The district court determined that this Court wrongly decided these cases in the first instance, not that its opinions were subsequently doubted by a Florida appellate court.

The district court's reason for distinguishing *Port Consolidated* and *South Central* also misses the mark. The district court emphasized that the events construed as multiple occurrences in those cases occurred over a period of more than one year. *Koikos* rejected this same time-based argument: "To hold that the number of occurrences is determined by the time between each shot would turn an insurance coverage issue into an intensive fact-based inquiry requiring the selection of an arbitrary time interval to distinguish a single occurrence from multiple occurrences." *Koikos*, 849 So. 2d at 272. The district court erred by basing its ruling on an interpretation *Koikos* itself described as an unworkable standard.

---

[1] Evanston acknowledges that *Lamberti* and *City of Miami* are unpublished and not binding precedent. The district court did not decline to follow the decisions on that basis, though, and instead rejected them on the merits. Further, these decisions in turn relied on *Guideone*, which is binding precedent.

The district court—not this Court—misapplied *Koikos*. Even if the district court disagreed with this Court's prior decisions, it should not have rejected them. *Koikos* does not allow the insured to pick whatever outcome it desires when sued for negligence arising from a multiple victim shooting. The cause theory mandates that each injury-causing gunshot is a separate occurrence as a matter of law.

### C. The District Court Relied on Inapposite Authority.

In lieu of following this Court's decisions, the district court relied heavily on *Taurus Holdings, Inc. v. U.S. Fidelity and Guarantee Co.*, 913 So. 2d 528 (Fla. 2005), a case addressing lawsuits by municipalities against a gun manufacturer for damages arising from gun violence in their communities. *Id.* at 530. This Court certified to the Florida Supreme Court the question of whether the products-completed operations hazard exclusion in the gun manufacturers' commercial liability policy barred coverage. *Id.* at 531. To answer that question, the Florida Supreme Court considered the phrase "arising out of" in that exclusion. *Id.*

The Court analyzed precedent and found "arising out of" unambiguous. *Id.* at 540. The Court explained that *Koikos* did not resolve the issue because it addressed the definition of "occurrence" as related to an accident, not "arising out of" as related to a policy exclusion. *Id.* at 534. The Court stated in passing, however, that *Koikos* found the policy language at issue "susceptible to varying interpretations including not only an 'accidental event' but also 'injuries or damage' that are 'neither expected

nor intended from the standpoint of the insured.'" *Id.* at 534.

The district court homed in on this statement to conclude the Florida Supreme Court clarified that *Koikos* was decided solely on ambiguity grounds. This statement was irrelevant to the issue at bar. The Court declined to apply *Koikos* in the *Taurus* case, which addressed a different issue in a different context. That passing description is not controlling law. *E.g.*, *Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020) ("Any statement of law in a judicial opinion that is not a holding is dictum."); *Village of Palmetto Bay, Fla. v. 17777 Old Cutler Road, LLC*, 390 So. 3d 88, 88 n.2 (Fla. 3d DCA 2023) ("When a court makes a pronouncement of law that is ultimately immaterial to the outcome of the case, it cannot be said to be part of the holding in the case" (citation omitted)).

The district court reasoned that other courts—including this Court—must have overlooked *Taurus* in determining the term "occurrence" to be unambiguous. Just the opposite is true. This Court has not relied on *Taurus* because it has no bearing on the question of how to interpret "occurrence" in a liability policy. The district court should not have declined to follow this Court's precedent based on dicta.

The district court likewise erred in relying on *Maddox v. Florida Farm Bureau General*, 129 So. 3d 1179 (5th DCA 2014), a case resulting in three separate opinions arising from an incident in which a dog bit two different children in the same

apartment—a novel factual scenario distinct from *Koikos* and this case. *Id.*at 1180. Judge Palmer found the same "occurrence" definition at issue here ambiguous under this new factual scenario and construed it in the insured's favor to find the incident resulted in multiple occurrences. *Id.* Judge Orfinger concurred specially, but he did not discuss whether the policy was ambiguous. *Id.* Instead, Judge Orfinger focused on the cause theory and emphasized that the immediate cause of the injuries was the dog attacks, not the insured's negligent failure to control his dog. *Id.* Lastly, Judge Berger dissented and reasoned that the incident resulted in only one occurrence. *Id.* at 1183–84. Thus, only one judge on the three-judge panel expressly found that *Koikos* was decided based on ambiguity. In any event, the court ultimately held that a dog biting two children in quick succession constituted two separate occurrences, not one occurrence.

Finally, the district court favored distinguishable cases addressing statutory sovereign immunity over this Court's opinions interpreting identical policy language. The district court cited *Barnett v. Department of Financial Services*, 303 So. 3d 508 (Fla. 2020), in which the Florida Supreme Court considered the sovereign immunity statute capping liability at $300,000 for judgments "arising out of the same incident or occurrence." *Id.* at 510. The Court found *Koikos* irrelevant to the question at bar, explaining that because the statute "does not use the word 'accident,' and given the wholly different contexts, we find the argument based upon the insurance

policy cases unhelpful and unpersuasive." *Id.* at 516. The Court further noted that it must narrowly construe a statute waiving sovereign immunity. *Id.*

These decisions do not control in determining the number of "occurrences." Unlike these distinguishable cases, this Court's opinions in *Guideone*, *Lamberti*, *City of Miami*, and others are squarely on point and interpret the same policy language. The district court erred by rejecting longstanding precedent and misinterpreting *Koikos* as a decision based on a determination that the policy language at issue was ambiguous.

### D.  Each Shooting Constituted a Separate Occurrence.

*Koikos* is clear. Under the cause theory, when a shooting involves multiple gunshots and injures multiple victims, and the victims sue the insured for negligent security, each injury-causing gunshot creates a separate occurrence. No court applying Florida law reached a contrary result under similar facts until this case.

The cause theory compels a determination that the Parkland Shooting Incident resulted in multiple occurrences subject to separate SIRs. BSO relied solely on its ambiguity argument because it cannot distinguish *Koikos* on the merits. Accordingly, this Court should reverse and remand with instructions to enter final judgment for Evanston, declaring that BSO must exhaust a separate $500,000 SIR for each victim arising from the Parkland Shooting Incident.

## IV.   The District Court Erred in Applying *Contra Proferentem*.

Even were this Court to find the term "occurrence" to be ambiguous, it should not construe that term in BSO's favor. *Contra proferentem* does not apply when a sophisticated insured negotiates the policy's terms. The district court erred by failing to consider extrinsic evidence that BSO intentionally obtained a policy without a related occurrence endorsement in order to lower its premium. This Court should hold BSO to the terms for which it consciously bargained and construe the Parkland Shooting Incident as multiple occurrences.

### A.   *Contra Proferentem* Under Florida Law.

Florida recognizes *contra proferentem*, a common law canon requiring courts to construe ambiguous insurance policy language "against the drafter who prepared the policy." *Anderson,* 756 So. 2d at 34; *see also Travelers Ins. Co. v. Bartoszewicz*, 404 So. 2d 1053, 1054 (Fla. 1981) (explaining that ambiguities are construed against the drafter of an insurance policy, which is "more often the insurer").

In a plurality opinion, the Florida Supreme Court stated that ambiguous insurance policy language should be construed against the drafting insurer without resort to extrinsic evidence. *Washington Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 945 (Fla. 2013). Florida's First District Court of Appeal recognized that *Ruderman* "arguably does not constitute binding precedent prohibiting the consideration of extrinsic evidence when construing an ambiguous insurance

contract in Florida." *Musselwhite v. Fla. Farm Gen. Ins. Co.*, 273 So. 3d 251, 257 n.1 (Fla. 1st DCA 2019). Notwithstanding, this Court generally follows *Ruderman* when confronted with ambiguous policy langauge. *E.g.*, *Shiloh Christian Ctr. v. Aspen Specialty Ins. Co.*, 65 F.4th 623, 628 (11th Cir. 2023). But the insurers in *Ruderman* and *Shiloh Christian* never argued for a sophisticated insured exception.

### B. The Sophisticated Insured Exception.

No Florida precedent directly addresses whether an exception to *contra proferentem* applies based on the insured's sophistication. Courts at common law construed ambiguous insurance policy language against insurers to protect laypersons, not complex entities with risk management departments represented by specialized insurance brokers. For that reason, numerous jurisdictions decline to apply the doctrine under these circumstances and instead consider extrinsic evidence of the parties' intent to resolve ambiguous insurance policy language.

This Court has routinely applied this widely recognized exception to *contra proferentem* when considering the issue under different state law. *See ECB USA, Inc. v. Chubb Ins. Co. of N.J.*, 2024 WL 3975776, at *11 (11th Cir. Aug. 29, 2024) (applying New Jersey law and declining to apply doctrine where insured was a sophisticated entity); *Stonegate Bank v. TD Bank N.A.*, 596 F. App'x 834, 844 (11th Cir. 2015) (same under Georgia law). When presented with the question of whether Florida law recognizes this exception, this Court did not reach the merits because it

found the challenged policy language unambiguous. *Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*, 856 F.3d 1343, 1348 n.4 (11th Cir. 2017).[2]

The underlying rationale for *contra proferentem* supports an exception for sophisticated entities who negotiate at arm's length with the insurer. The doctrine protects laypersons because "the insurance policy is generally an adhesion contract and therefore the insured has no ability to negotiate for or control the wording of the provisions contained therein." *Castleberry v. Goldome Credit Corp.*, 418 F. 3d 1267, 1272 (11th Cir. 2005) (quoting *Holmes's Appleman on Ins.*, § 6.5, at 213–14). The Florida Supreme Court has long recognized that public policy supports construing ambiguities against an insurer who drafts a policy that is "intricate and difficult for the layman to understand." *Bartoszewicz*, 404 So. 2d at 1054 n.4 (quoting *Praetorians v. Fisher*, 89 So. 2d 329, 333 (Fla. 1956)).

District courts applying Florida law logically decline to apply *contra*

---

[2] Numerous other states also recognize the sophisticated insured exception. *See, e.g.*, *BellSouth Commc'ns Sys., L.L.C. v. West*, 902 So. 2d 653, 657 (Ala. 2004) (Alabama law); *Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 480 P.3d 1225, 1229 (Ariz. 2021) (Arizona law); *First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 568 (7th Cir. 2009) (Illinois law); *Lamar Advertising Co. v. Zurich Am. Ins. Co.*, 533 F. Supp. 3d 332, 349–50 (M.D. La. 2021) (Louisiana law); *Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460, 466 (D. Md. 1998) (Maryland law); *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 693 (Minn. 2018) (Minnesota law); *Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257, 1261 (5th Cir. 1976) (Missouri law); *Cummins, Inc. v. Atl. Mut. Ins. Co.*, 867 N.Y.S.2d 81, 83 (1st Dep't 2008) (New York law); *E. Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1075 (3d Cir. 1980) (Pennsylvania law).

*proferentem* when "the insured is a sophisticated commercial entity which has participated in drafting the policy." *RTG Furniture Corp. v. Indus. Risk Ins.*, 616 F. Supp. 2d 1258, 1264 (S.D. Fla. 2008); *see also Cardinal Point, LLC v. Edgewood Partners Ins. Ctr., Inc.*, 2024 WL 1632740, at *7 n.9 (S.D. Fla. Apr. 16, 2024) ("[T]hat rule of construction is inapplicable here, where the contract was negotiated between sophisticated parties."); *El-Ad Residences at Miramar Condo. Ass'n, Inc. v. Mt. Hawley Ins. Co.*, 2010 WL 11506385, at *2 n.1 (S.D. Fla. Dec. 9, 2010) ("Because of El-Ad's involvement in the procurement of the policy, it would likely have qualified as the type of 'sophisticated entity' that is not entitled to a presumption of coverage when an ambiguity exists.").

While no Florida appellate court has squarely addressed the issue, the Fourth District's opinion in *Warwick Corp. v. Alliant Insurance Services, Inc.*, 227 So. 3d 621 (Fla. 4th DCA 2017), supports recognizing the exception. There, the insured was a "sophisticated business entity" that had primary and excess insurance for its hotels. *Id.* at 626. On appeal, Warwick unsuccessfully argued that the trial court "erred in considering extrinsic evidence to resolve the allegedly ambiguous policy." *Id.* at 624. The appellate court found no error and agreed that the extrinsic evidence clearly established the parties' intent. *Id.* at 624–26.

Further, in *The School Board of Broward County v. The Great American Insurance Co.*, 807 So. 2d 750, 752 (Fla. 4th DCA 2002), the insurer issued a bond

on a form prepared by the insured school board. *Id.* at 750–51. The insurer argued that any ambiguity in the bond should be construed against the school board because it drafted the bond form. *Id.* at 752. The Fourth District rejected that argument, reasoning that "[t]his was a bond negotiated between sophisticated parties. Because bonds are its business, Great American was hardly at a disadvantage in dealing with the School Board." *Id.*

There is no indication that the Florida Supreme Court would reject the sophisticated insured exception recognized by a myriad of other states and district courts applying Florida law. Recall that *contra proferentem* is not a creature of Florida statute, but rather a common law doctrine with common law exceptions. An entity like BSO with lawyers, risk managers, and brokers should not receive the same lenity afforded by *contra proferentem* as a lay insured who obtains a standard adhesion policy. This case demonstrates why many other jurisdictions have so ruled.

### C.    BSO is a Sophisticated Insured.

While BSO opposed recognizing an exception to *contra proferentem*, it never disputed that it is a sophisticated entity. BSO's annual budget exceeds one billion dollars. It has a general counsel's office and risk management department, employing attorneys who specialize in the insurance industry. BSO is self-insured, handles its own claims, and hires and pays its own defense counsel. *See Cummins, Inc.*, 867 N.Y.S.2d at 83 (declining to apply *contra proferentem* where insured "had

equal bargaining power and acted like an insurance company by maintaining a self-insured retention").

BSO working with Marsh, the largest international insurance broker, provides further indicia of sophistication. *See Resolving Ambiguities in Insurance Policy Language: The Contra Proferentem Doctrine and the Use of Extrinsic Evidence*, THE AMERICAN BAR ASSOCIATION (May 2003) at p. 24 ("Brokers such as Marsh . . . have the resources and leverage to develop their own policy forms and to apply substantial pressure on insurers to accept them."). Marsh has a department dedicated to public entities like BSO. It held monthly insurance calls and annual renewal strategy meetings to discuss BSO's insurance program. Marsh actively solicited policies, negotiated specific terms, and otherwise made all efforts to secure BSO the best possible insurance coverage.

To the extent Florida law recognizes a sophisticated insured exception, it applies to BSO. The evidence shows that BSO and Marsh negotiated both the initial and renewed Policy, requested several changes, and otherwise stood on an even playing field with Evanston. This was not an adhesion contract scenario justifying application of a common law doctrine intended to protect laypersons. *See In re Delta Am. Re Ins. Co.*, 900 F.2d 890, 893 n.4 (6th Cir. 1990) ("The principle of resolving ambiguities against the drafter is an interpretive aid of greater value when dealing with contracts of adhesion or contracts negotiated between parties of unequal

sophistication or bargaining power. Such is not the case here.").

For these reasons, if this Court finds the term "occurrence" ambiguous, it should not automatically accept BSO's favored interpretation. Instead, it should consider evidence demonstrating the parties' intent to treat losses like the Parkland Shooting Incident as multiple occurrences by eliminating language contained in the immediate predecessor policy modifying the standard "occurrence" definition.

### D. The Parties Intended to Treat the Parkland Shooting Incident as Multiple Occurrences.

The evidence demonstrates that BSO and Marsh knowingly solicited a policy that did not group together related occurrences arising from the same incident as one occurrence. BSO had excess coverage with State National from 2003 until 2008. When BSO was sued in connection with mass arrests, it argued that the incident resulted in only one occurrence. This Court rejected BSO's interpretation and held that the incident constituted multiple occurrences. *Lamberti*, 362 F. App'x. at 82.

BSO next obtained excess insurance with Lexington. In response to *Lamberti*, BSO and Marsh ensured that the Lexington policy would not treat similar multiple-victim events as separate occurrences. The parties agreed to an endorsement providing that one $500,000 SIR would apply to a "single event," which was defined as a "series of continuous, repeated, or related occurrences . . . arising out of the same related facts or circumstances regardless of the number of Insureds, claimants, claims made or suits brought." (Doc. 91-1 at 31).

By including this language, BSO sought to avoid the result compelled by *Koikos*, *Lamberti*, and similar cases requiring a finding of multiple occurrences subject to separate $500,000 SIRs. *See, e.g.*, *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262 (11th Cir. 2000) (finding "related wrongful act" language unambiguous in professional liability policy); *Pac. Emps. Ins. Co. of L.A. v. Ott*, 545 So. 2d 462, 463 (Fla. 3d DCA 1989) ("[T]he policy unambiguously provides that multiple claims or suits arising out of a single act of [sic] omission or related series of acts or omissions are to be treated as one claim providing a coverage limit of $100,000.").

BSO made a business decision not to pay the premium for that endorsement going forward. Lexington sought to nearly double BSO's premium for the next year, leading BSO and Marsh to seek excess coverage elsewhere. Evanston provided a quote based on the standard "occurrence" language, and Marsh and BSO proceeded to negotiate with Evanston, requesting changes to various terms, forms, pricing, and retentions. Further, both Marsh and BSO reviewed the renewal policy to ensure it contained all provisions, terms, and conditions BSO desired.

BSO and Marsh never requested that the Policy include a related occurrence endorsement or similar language during the initial or renewal negotiations. Omitting that language likely saved BSO premium, which was BSO's impetus for seeking new coverage in the first place. BSO and Marsh were well-versed in Florida law interpreting and applying the term "occurrence" in multiple-victim situations. They

certainly knew how to modify the standard "occurrence" language appearing in BSO's other excess policies. BSO knowingly agreed to the standard language applying a separate $500,000 SIR to each occurrence.

The district court effectively granted BSO the protections of related occurrence language for free by accepting BSO's tortured interpretation of *Koikos*. The district court should not have rewarded BSO in this manner. BSO's choice not to request a related occurrence endorsement "was the decision of a sophisticated, fully informed party" and Evanston should not be faulted for the fact that BSO "wishes that it had paid a higher premium for a policy" with that language. *Zucker*, 856 F.3d at 1353; *see also First Call 24/7, Inc. v. Citizens Prop. Ins. Corp.*, 333 So. 3d 1180, 1182 (Fla. 1st DCA 2022) (*contra proferentem* cannot be used to "rewrite the contracts, add meaning that is not present, or otherwise reach results contrary to the manifest intention of the parties" (quoting *Allstate Ins. Co. v. Shofner*, 573 So. 2d 47, 49 (Fla. 1st DCA 1990))).

The district court further explained that the exception does not apply because BSO did not draft the definition of the term "occurrence." In doing so, the district court failed to appreciate the nuance between two separate issues. *Contra proferentem* applies against the drafter of the policy, which is often, but not always, the insurer. *See Bartoszewicz*, 404 So. 2d 1053, 1054 n.4. Had BSO drafted the definition at issue, it could not rely on *contra proferentem* to construe its own

purportedly ambiguous language. The sophisticated insured exception focuses not on which party drafted the specific provision at issue, but rather on the parties' relative bargaining power and the extent to which the insured negotiated the coverage. *See, e.g.*, *Cardinal Point, LLC.*, 2024 WL 1632740, at *7 (applying exception "where the contract was negotiated between sophisticated parties").

This case demonstrates why courts nationwide widely recognize a sophisticated insured exception to *contra proferentem*. BSO is self-insured, represented by lawyers and international brokers, and has litigated cases turning on the same "occurrence" language. BSO knew the difference in how the policy applied with and without the related occurrence endorsement, and it "chose to buy the policy that it bought." *Warwick Corp.*, 227 So. 3d at 626.

Therefore, even if this Court finds "occurrence" ambiguous, the parties unquestionably intended to treat losses like the Parkland Shooting Incident as multiple occurrences subject to separate $500,000 SIRs. This Court should reverse.

*  *  *  *

Given the dearth of direct Florida state court authority, to the extent this Court remains unclear as to how to interpret and apply *Koikos* and/or whether Florida law recognizes a sophisticated insured exception to *contra proferentem*, this Court should avoid making an *Erie* guess contrary to the reasoning set forth above. *See In re Cassell*, 688 F.3d 1291, 1300 (11th Cir. 2012) ("When there is substantial doubt

about the correct answer to a dispositive question of state law, a better option is to certify the question to the state supreme court.").

## CONCLUSION

For the reasons stated herein, Evanston respectfully requests that this Court reverse the final judgment in favor of BSO and remand for entry of final judgment for Evanston.

October 4, 2024    Respectfully submitted,

**CARLTON FIELDS, P.A.**

*/s/ Joseph H. Lang, Jr.*
Joseph H. Lang, Jr. (FBN 059404)
4221 W. Boy Scout Boulevard
Tampa, FL 33607-5780
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
Email: jlang@carltonfields.com

Samuel B. Spinner (FBN 118922)
700 N.W. 1st Avenue
Suite 1200
Miami, Florida 33136
Telephone: (305) 530-0050
Facsimile: (813) 530-0055
Email: sspinner@carltonfields.com

*Attorneys for Defendant/Appellant*
*Evanston Insurance Company*

**CERTIFICATE OF COMPLIANCE**

The undersigned attorney hereby certifies that this initial brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,640 words, excluding the parts exempted by Fed. R. App. P. 32(f). The undersigned attorney also certifies that this initial brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman 14-point font.

*/s/ Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing initial brief was electronically filed with the Clerk of the Court using CM/ECF, which will cause to be sent a Notice of Electronic Filing to all counsel of record this 4th day of October, 2024.

I FURTHER CERTIFY THAT six paper copies of the initial brief were dispatched to the Clerk's Office by Federal Express and paper copies of the initial brief were dispatched to the following individuals by Federal Express this 4th day of October, 2024.

David Ferguson
Seth Haimovitch
Alexis Fields
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301

Jason S. Mazer
**MAZER LAW P.A.**
255 Alhambra Circle | Suite 1160
Coral Gables, Florida 33134

*/s/ Joseph H. Lang, Jr.*
Joseph H. Lang, Jr.
